IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

RUSSELL A. FOLKERS,

    Plaintiff,

vs.

CITY OF WATERLOO, IOWA,
DARREL JOHNSON, in his individual
capacity and as Animal Control Officer
for City of Waterloo, Iowa, and MARIA
TILLER, in her individual capacity and
as Animal Control Officer for the City of
Waterloo, Iowa,

    Defendants.

No. C07-2066

REPORT AND RECOMMENDATION

## TABLE OF CONTENTS

I.    *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   *PROCEDURAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *ISSUE PRESENTED.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  *RELEVANT FACTS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V.   *APPLICABLE CITY ORDINANCES.* . . . . . . . . . . . . . . . . . . . . . 7

VI.  *ANALYSIS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    A.    Is Folkers Entitled to a Preliminary Injunction, Returning
         Possession of Cleo to Him While the Appeal is Pending? . . . . . . . . . 9
         1.    Will Folkers suffer irreparable harm if a preliminary
              injunction does not issue? . . . . . . . . . . . . . . . . . . . . 10
         2.    How Does the Harm Suffered by Folkers Balance Against the
              Injury that Granting an Injunction Would Inflict on
              Defendants? . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   *3. What is the Probability that Folkers Will Succeed on the Merits?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   *4. Where Does the "Public Interest" Lie?* . . . . . . . . . . . . . . . 16
   *5. Summary.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  *B. Is Folkers Entitled to a Preliminary Injunction, Prohibiting the City Council From Relying on the Third Alternative Definition of "Dangerous Dog?"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*VII. SUMMARY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*VIII. RECOMMENDATION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## I. INTRODUCTION

On the 9th day of October 2007, this matter came on for hearing on the Request for Hearing on Temporary Injunction (docket number 4) filed by the Plaintiff on September 27, 2007. Plaintiff Russell A. Folkers appeared personally and was represented by his attorney, Thomas P. Frerichs. Defendant City of Waterloo was represented by its attorney, Timothy C. Boller. Defendants Darrel Johnson and Maria Tiller appeared personally at the time of hearing and were also represented by Mr. Boller.

## II. PROCEDURAL BACKGROUND

On September 25, 2007, Plaintiff Russell A. Folkers ("Folkers") filed a Complaint (docket number 2) requesting compensatory damages against Defendants, pursuant to 42 U.S.C. § 1983. On September 27, 2007, Folkers filed the instant Request for Hearing on Temporary Injunction or, in the Alternative, for a Temporary Restraining Order. District Judge Edward J. McManus referred the Application to the undersigned Magistrate Judge for a Report and Recommendation. *See* Order (docket number 5).

On October 2, 2007, the Court filed its Report and Recommendation (docket number 7), recommending that a Temporary Restraining Order be issued, prohibiting the Waterloo City Council from proceeding with an appeal hearing until the Court had an opportunity to consider Plaintiff's request for a preliminary injunction. The Court further recommended that the request for a preliminary injunction be set for hearing, with

2

appropriate notice given to Defendants. District Judge Edward J. McManus adopted the Report and Recommendation, entered a Temporary Restraining Order, and referred the matter to the undersigned Magistrate Judge for a report and recommendation on Plaintiff's request for a preliminary injunction. *See* Order (docket number 8). The Court then set Plaintiff's request for a preliminary injunction down for hearing.

### III. ISSUE PRESENTED

In his request for a preliminary injunction, Plaintiff seeks two orders: First, Plaintiff requests that the Court enter an order requiring the City of Waterloo to return possession of Plaintiff's dog and to permit Plaintiff "enough time to prepare for the appeal hearing"; and second, Plaintiff asks the Court to determine that a portion of the City ordinance defining "dangerous dog" is unconstitutionally vague and may not be relied upon by the City.

### IV. RELEVANT FACTS

Plaintiff Russell Folkers, who resides in the City of Waterloo, is the owner of a five-year-old mixed-breed dog named "Cleo." According to Folkers, Cleo is half Pitbull and half American Bulldog. On Sunday, August 26, 2007, Cleo and another dog ("Lexus") were running loose on Folkers' property. Folkers testified that Lexus is a full-bred American Bulldog which belongs to his son, but stays with Folkers when his son is in town.[1]

Rosemary Parr and her family have lived across the street from Folkers' property since mid-June 2007. Parr owns a Bichon Frise by the name of "Sassy." During the late afternoon on August 26, Parr's daughter put Sassy on a leash and took her outside for a walk. Within seconds, however, Parr's daughter returned to the house and reported that Sassy was being attacked. When Parr went outside, she saw that two dogs had Sassy

---

[1] Black Hawk Animal Control Officer Maria Tiller testified that when Cleo and Lexus were vaccinated for rabies, the veterinarian showed both dogs were owned by Folkers.

3

pinned to the ground. Parr yelled at the other dogs and tried to hit them with a dishrag, but was unable to deter them. Parr went back inside to get her husband, and by the time she returned the dogs had carried Sassy across the street.[2] As a result of the attack, Sassy suffered serious injuries and was hospitalized at a veterinarian's office for five days. It is undisputed that the two dogs involved in the attack were Cleo and Lexus.

Rosemary Parr reported the incident to animal control authorities and it was investigated by Defendant Darrel Johnson ("Johnson"), a part-time Black Hawk Animal Control Officer. Johnson testified that he responded to the scene, discussed the incident with Mr. Parr, and then went across the street to discuss the matter with Folkers. No one responded to the door, however, and Johnson did not hear any dogs, so he left a "door hanger" on the Folkers residence, requesting that he be contacted. Johnson then waited at the end of the street to see if anyone came to the Folkers residence. No one appeared, however, and Johnson then left. That evening, Johnson called Defendant Maria Tiller ("Tiller"), a full-time Black Hawk Animal Control Officer. According to Tiller, she and Johnson discussed the matter briefly, but did not talk about seizing the dogs at that time.

On the following morning (Monday, August 27), Folkers called the animal control office, apparently in response to the notice left on his door, but Johnson was not in. When Johnson returned to the office, he called Folkers back. Johnson testified that he advised Folkers during the phone call that he would be issued a citation for dogs running at large and Folkers repeatedly asked him what their intentions were regarding Cleo. Johnson advised Folkers that they would discuss it when he delivered the citations, which the parties agreed would be the following day. During the phone call, Plaintiff told Johnson that Lexus was with his son, and was no longer at the residence.[3]

---

[2] Folkers testified that Cleo "picked it up" and "playingly" brought it back to Folkers' property.

[3] When asked at the instant hearing where Lexus is now, Folkers answered, "I'm not sure."

4

Officer Tiller testified that after Johnson's telephone conversation with Folkers, she made a decision to seize Cleo. According to Tiller, the factors which she considered in making that determination included the serious injuries suffered by Sassy in the attack, the history of Animal Control responding to Folkers' property, reports that Folkers would intimidate his neighbors when complaints were made, the fact that Lexus was gone, and the fact that Folkers is a truck driver, thereby allegedly making it easier for him to remove the dog from the City's jurisdiction.

Tiller testified that prior to deciding to seize Cleo, she contacted the veterinarian where Sassy was being treated and was advised that the injuries were life-threatening. She also reviewed the prior reports regarding calls to the Folkers residence. The reports (Plaintiff's Exhibit 4) reflect five calls for dogs running at large, and one complaint of barking dogs, between April 13, 2002, and February 24, 2005.[4] Two of the reports (05/10/2002 and 06/22/2003) refer to threats to neighbors, allegedly made by Folkers in retaliation for their complaints.

On Tuesday, August 28, Officer Johnson went to Folkers' home and delivered four citations (Defendants' Exhibit D). Folkers was cited twice for "dog at large," in violation of § 5-1A-6A of the Waterloo City Ordinances, and two counts of "fear of attack," in

---

[4] In the Findings of Fact drafted by Officer Tiller in the Order (Plaintiff's Exhibit 1) of August 29, 2007, she wrote that "Animal Control Officers had had [sic] prior contact with these dogs on at least six prior occasions for dogs running at large and being aggressive towards humans." In support of her allegation that "these dogs" had been aggressive toward humans, Tiller testified that the report dated May 10, 2002, was from a neighbor who had reported that one of Folkers' dogs aggressively approached the neighbor and was barking. The complaint was made to another animal control officer, but Tiller testified that the complainant called her the following day and asked that it not be pursued, because the complainant was afraid of Folkers' reaction. Folkers testified that Cleo was one of nine in a litter born in February 2002. Accordingly, it is unlikely that Cleo was the dog referred to in the May 2002 complaint.

5

violation of Ordinance 5-1A-6B.[5] Johnson advised Folkers that he was seizing Cleo, and Folkers cooperated in loading Cleo into the truck. Johnson acknowledged that Cleo was "friendly" when he was placed in the vehicle.[6]

On Wednesday, August 29, Officer Tiller drafted a "dangerous dog" Order (Plaintiff's Exhibit 1), which was sent by certified mail to Folkers, along with a cover letter (Defendants' Exhibit C) drafted by Tiller. The Order concludes that Cleo is a "dangerous dog" as defined by City Ordinance, and "orders that 'Cleo' be removed from the City or be humanely destroyed." Similarly, the cover letter advises Folkers that "[y]ou are hereby ordered to remove such dog from the city limits or humanely destroy it."[7]

The cover letter also advised Folkers that he had seven days in which to appeal the Order to the Waterloo City Council. Folkers submitted a timely appeal. *See* Plaintiff's Exhibit 2. An appeal hearing was scheduled before the Waterloo City Council on September 24, 2007. Immediately prior to the hearing, however, Assistant City Attorney David Zellhoefer informed the City Council that Folkers and his attorney had requested a continuance of the hearing in order to seek an evaluation of Cleo to determine her dangerousness. The City Council agreed to a continuance of the hearing, but a discussion ensued regarding whether Cleo should remain in the City's possession pending the rescheduled hearing. According to the hearing minutes (Plaintiff's Exhibit 5), both Attorney Zellhoefer and Officer Tiller suggested that if the owner has an enclosed pen, then the City Ordinance anticipates that the dog would remain in the owner's possession

---

[5] While there was no direct evidence on the issue, a review of Plaintiff's Exhibit 5 suggests that trial on the citations is scheduled on October 15, 2007.

[6] When delivering the citations on Tuesday, Folkers asked Johnson why he had stopped at the end of the block on Sunday evening, thereby suggesting that there may have been someone home when Johnson first approached the residence.

[7] Defendants apparently fail to see the irony in their refusal to return Cleo because they are afraid Folkers will remove her from the City, while at the same time, they are *ordering* that Folkers remove Cleo from the City.

6

pending the appeal process. Nonetheless, the City Council voted unanimously to retain Cleo in the City's possession until the appeal has been decided. On the following day, Folkers initiated the instant action.

## V. APPLICABLE CITY ORDINANCES

The applicable City Ordinances were introduced as Defendants' Exhibit F. Section 5-1B-4(B) provides that no person shall "keep, shelter or harbor" a "dangerous dog" within the city. A "dangerous dog" is defined in § 5-1B-1, as follows:

> A. Any dog with a known propensity, tendency, or disposition to attack unprovoked, to cause injury to, or to otherwise endanger the safety of humans or other domestic animals; or
>
> B. Any dog which attacks a human being or other domestic animal without provocation; or
>
> C. Any dog declared to be dangerous by the city council or an animal control officer.

When an animal control officer determines that a dangerous dog is being kept within the city, the officer may order the owner to remove the dog from the city or destroy it. The order must be in writing and delivered personally or by certified mail.

> Order to Remove: In the event the animal control officer determines that a dangerous dog is being kept, sheltered or harbored by any individual or entity in violation of the provisions of this article, the animal control officer may, in his discretion, have such individual or entity prosecuted for such violation, and he may order such individual or entity to remove such dangerous dog from the city or destroy it. Such order shall be contained in a notice to remove dangerous dog, which notice shall be given in writing, directed to such individual or entity, and delivered personally or by certified mail. Such order of the animal control officer shall be appealable to the city council, which may affirm or reverse such order, and the notice shall so state.

*See* Waterloo City Ordinances, § 5-1B-4(E) (Defendants' Exhibit F).

7

Upon being served with such an order, the owner may appeal to the city council by filing a written appeal within seven days. *See* § 5-1B-4(F). A hearing must be held within thirty days after receipt of a notice of appeal, with a decision by the city council filed with the city clerk within twenty days after the hearing. *Id.*

If the city council affirms the order of the animal control officer, then the owner has seven days in which to "remove such animal from the city or destroy it." If the owner fails to comply within seven days following the issuance of the City Council's order, then the animal control officer "is authorized to seize and impound such dangerous animal."

> Failure To Comply With Order: If the city council affirms the action of the animal control officer, the city council shall also order in its written decision that the individual or entity owning, sheltering, harboring or keeping such dangerous animal, remove such animal from the city or destroy it. The decision and order shall immediately be served upon the person or entity against whom rendered in the same manner as the notice of removal. If the order is not complied within seven (7) days of its issuance, the animal control officer is authorized to seize and impound such dangerous animal. An animal so seized shall be impounded for a period of seven (7) days. If at the end of the impoundment period, the individual or entity against whom the decision and order of the city council was issued has not petitioned the Black Hawk County District Court for a review of the order, the animal control officer shall cause the animal to be disposed of by sale or destroyed in a humane manner. Failure to comply with an order of the city council issued pursuant thereto shall constitute a misdemeanor, and be punishable by a fine of not less than twenty dollars ($20.00), or constitute a municipal infraction violation.

*See* Waterloo City Ordinances, § 5-1B-4(G) (Defendants' Exhibit F).

The City Ordinance also directly addresses the issue of confinement of the dog during the appeal process.

> Confinement During Appeal: During the appeal process, if the owner does not have a securely enclosed and locked pen, the owner shall confine the dangerous dog within the owner's

8

residence, at the Black Hawk Humane Society, Inc., at a veterinarian or at a kennel. This confinement shall be at the owner's expense.

*See* Waterloo City Ordinances, § 5-1B-4(H) (Defendants' Exhibit F).

The confinement provisions of § 5-1B-4(H) are consistent with the provisions of § 5-1B-4(C), which provides that a dangerous dog may be "securely confined indoors or confined in a securely enclosed and locked pen or structure upon the premises of the owner of such dog," but only "if the owner is awaiting an appeal or a decision of the city council to determine if the dog is a dangerous dog under the terms of this article."

## *VI. ANALYSIS*

In his Complaint (docket number 2), Folkers seeks compensatory and punitive damages pursuant to 42 U.S.C. § 1983. Specifically, Folkers claims that the Defendants violated the Fifth and Fourteenth Amendments to the United States Constitution by "the taking of his property under color of law without affording him due process of law."[8] In addition, Folkers seeks injunctive relief in his Complaint, requesting (1) that Cleo be returned to him pending the appeal, (2) that the appeal proceedings be stayed until his "due process rights can be satisfied," and (3) that a portion of the city ordinance defining "dangerous dog" be declared unconstitutionally vague. A Temporary Restraining Order was previously issued, granting the requested stay. The remaining two issues are the subject of the instant hearing.

### *A. Is Folkers Entitled to a Preliminary Injunction, Returning Possession of Cleo to Him While the Appeal is Pending?*

When analyzing the issues presented, it is important to remember the procedural posture of this case. The issue of whether Cleo is, in fact, a "dangerous dog" is not before the Court. In addition, the Court is not required to determine at this time whether Folkers is entitled to monetary damages pursuant to § 1983 for an alleged deprivation of his

---

[8] *See* Complaint (docket number 2), ¶ 4 at 2.

9

constitutional rights.[9] That determination will require consideration of the affirmative defenses raised by Defendants in their Answer (docket number 13), including whether Defendants have qualified immunity. Rather, the issue currently before the Court is whether Folkers is entitled to injunctive relief, requiring that Cleo be returned to his possession pending an appeal before the Waterloo City Council.

The factors to be considered in determining whether a preliminary injunction should issue are well known and were enumerated in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981), as "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *See also In re Sac & Fox Tribe of the Mississippi in Iowa/Meskwaki Casino Litigation*, 340 F.3d 749, 758 (8th Cir. 2003). The Court will consider the identified factors in turn:

### 1. *Will Folkers suffer irreparable harm if a preliminary injunction does not issue?*

In his complaint, Folkers claims that possession of Cleo is necessary in order to have the dog evaluated prior to the hearing.

> By refusing to permit the Defendant [sic] to have possession of the dog during the appeal, the Defendants, and each of them, have effectively denied Plaintiff the ability to have the dog examined by a veterinarian of his choice to present relevant evidence during the appeal hearing contesting the dangerous nature of his dog. Irreparable harm will come to the Plaintiff's property should he not be permitted to obtain and present favorable evidence at the time of the hearing on his appeal.

*See* Complaint (docket number 2), ¶ 20 at 4.

---

[9] Defendants note that in *Skinner v. Chapman*, 326 F. Supp. 2d 431, 433 (W.D.N.Y. 2004), the Court concluded that even if a dog was seized unreasonably and held by authorities for eleven days before returning the animal to its owners, the temporary taking "does not constitute an unlawful seizure and does not raise a constitutional violation."

10

Similarly, in his request for a temporary injunction, Folkers claimed that it was necessary for Cleo to be returned to his home in order to have a "reliable evaluation" conducted.

> The Veterinarian at Klima Small Animal Clinic has advised the Plaintiff that a reliable evaluation of the dog can happen only after the dog has been returned to it's [sic] home and re-acclimated to its environment for a period of at least one week. Any evaluation done of the dog while the dog is still in "custody" at the Black Hawk County Humane Society would be improperly influenced by the dogs' [sic] current fear and isolation.

*See* Request for Hearing on Temporary Injunction (docket number 4-1), ¶ 2 at 2.

At the time of hearing, however, Folkers failed to offer any evidence in support of these claims. There was no testimony that Cleo must be returned to his home in order to have a valid behavioral evaluation conducted and, in fact, counsel implied that Plaintiff was no longer intending to seek such an evaluation. In his Supplemental Post-Hearing Brief (docket number 20), Folkers argues that "there is a factual question that was presented to the Court concerning whether or not Cleo would need to be re-accustomed to her home surroundings before a reliable evaluation of her so called 'dangerous' nature could be done." In fact, the only evidence offered on that issue was provided by Defendants, and indicated that Cleo's return home was not required for a behavioral evaluation.[10] Folkers' testimony on that issue was hearsay and not offered for the truth of the matter asserted.

Defendants offered the Affidavits of three veterinarians, suggesting that such an examination by a local veterinarian would not have any probative value.[11] According to Dr. T. James Taylor, "[i]t is necessary to retain the services of a specialist with a Ph.D.

---

[10] Folkers admitted at the hearing that he understood Defendants would permit an evaluation of Cleo at the kennel where she is now being kept.

[11] Two of the three veterinarians also conducted physical examinations, and found Cleo in good health and appropriately cared for at the Cedar Bend Humane Society.

11

in animal behavior in order to properly evaluate whether 'Cleo' is a threat to attack or otherwise be aggressive towards humans, dogs or other animals."[12] Dr. Taylor further opined that the closest specialist in animal behavior is in Minneapolis, Minnesota. Similarly, Dr. Chris Lichty opined that "Plaintiff's proposed examination by a veterinarian will not provide any useful evidence in determining whether 'Cleo' is a dangerous dog."[13] Dr. Jerry Petersen offered a similar opinion: "An examination of the dog's behavior by a veterinarian may have limited value because of the veterinarian's experience and interest in animal behavior. Veterinarians who are not certified in animal behavior, lack the specific training necessary to conduct such an evaluation."[14]

Two of the three veterinarians also expressed the view that a behavioral evaluation may be conducted at the Cedar Bend Humane Society. According to Dr. Taylor, Cleo has "adjusted well" to her confinement, "trusts" the workers at the kennel, and an examination at the kennel "would be no different than an examination at Plaintiff's home."[15] Dr. Chris Lichty expressed a similar view.[16] Dr. Jerry Petersen suggested that these types of evaluations are regularly conducted "in the field," but suggested that the determination in that regard should be left to the specialist conducting the evaluation.

> It is not necessary for the examination or evaluation of the dog's behavior to be conducted at Plaintiff's home. Animal behavioral experts frequently conduct examinations in the field. The examination and evaluation of the dog's behavior can be conducted at the Cedar Bend Humane Society where the dog is presently located. Whether it is necessary to conduct the evaluation in a different setting should be determined at the

---

[12] *See* Affidavit of T. James Taylor, Defendants' Exhibit L.

[13] *See* Affidavit of Chris Lichty, Defendants' Exhibit M.

[14] *See* Affidavit of Jerry Petersen, Defendant's Exhibit N.

[15] *See* Affidavit of T. James Taylor, Defendants' Exhibit L.

[16] *See* Affidavit of Chris Lichty, Defendants' Exhibit M.

> time of examination by the specialist in animal behavior who
> is conducting the evaluation. At that time, the specialist can
> determine whether the dog's behavior has been tainted or
> affected by the environment in which the examination is being
> conducted. The specialist can then request further examination
> in a different setting.

*See* Affidavit of Jerry Petersen, Defendant's Exhibit N.

Rather than pursue his claim that possession of Cleo is necessary to have an evaluation conducted, Folkers argued at the time of hearing that he is entitled to temporary injunctive relief, returning Cleo to his possession, because Defendants failed to comply with the applicable city ordinances. That is, Folkers claims that he is entitled to a preliminary injunction because the pre-hearing seizure of Cleo violated his due process rights. While a determination of whether Defendants deprived Folkers of his property without due process is critical to his § 1983 claim, the Court believes that it misses the mark with respect to whether he will suffer irreparable harm by the failure to grant a preliminary injunction.

Folkers failed to establish that returning Cleo to his possession is necessary in order to have a behavioral evaluation conducted prior to the hearing. Accordingly, Folkers will not be irreparably harmed on the grounds initially claimed in his Complaint and Request for Injunction. In his Supplemental Post-Hearing Brief, however, Folkers argues that he is irreparably harmed if Cleo is not returned to his possession pending the appeal, because he "is now without the ability to exercise his discretion of whether or not to remove the Cleo [sic] from the city as ordered or humanely destroy the dog."[17] Folkers' argument ignores the fact, however, that he has appealed the preliminary determination that Cleo is a dangerous dog. If that finding is upheld by the City Council following a hearing, then Folkers may argue that the dog should be returned to his possession, so that he may

---

[17] *See* Supplemental Post-Hearing Brief (docket number 20) at 2.

13

Case 6:07-cv-02066-JSS    Document 21    Filed 10/12/07    Page 13 of 20

exercise the option of removing Cleo from the City. Folkers is not irreparably harmed, however, by Cleo remaining in the City's possession while the appeal is pending.

### 2. *How Does the Harm Suffered by Folkers Balance Against the Injury that Granting an Injunction Would Inflict on Defendants?*

As set forth above, the Court concludes that the issue of whether Cleo is a dangerous dog may be litigated while she remains in the City's possession, without irreparable harm to Folkers. Folkers also cites a financial incentive, however, in having Cleo returned to his possession, since Ordinance 5-1B-4(H) provides that confinement during the appeal "shall be at the owner's expense."[18] If it is later determined that Defendants deprived Folkers of his property without due process, then the financial implications of that deprivation may be addressed in Folkers' claim for monetary damages. The Court does not believe that it is a compelling argument for injunctive relief.

On the other hand, if Cleo is returned to Folkers' possession pending the appeal, there is some risk that she will be allowed to run free. While Folkers has a dog kennel on his property, it is apparent that he has failed to use that enclosure on numerous occasions in the past. On this occasion, Cleo left the property, crossed the street, and attacked a smaller dog which was on a leash held by the owner's daughter. Defendants have an interest in protecting the public and other domestic animals. *Hatch v. Grosinger*, 2003 WL 1610778 (D. Minn.) at *4. When weighing the respective potential harms to the parties, the Court concludes that entry of a preliminary injunction, returning Cleo to Folkers' possession pending the appeal, is not required.

### 3. *What is the Probability that Folkers Will Succeed on the Merits?*

In his Complaint, Folkers claims entitlement to damages pursuant to 42 U.S.C. § 1983, which provides generally that a person who, acting under color of law, deprives another person of a right secured by the Constitution, shall be liable to the injured party. The two "essential elements" of a § 1983 action are "(1) whether the conduct complained

---

[18] *See* Defendant's Exhibit F.

14

Case 6:07-cv-02066-JSS   Document 21   Filed 10/12/07   Page 14 of 20

of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

In this case, Folkers claims deprivation of rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.[19] The Fifth Amendment provides, in pertinent part, that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Similarly, the Fourteenth Amendment provides in relevant part that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. Folkers argues that he has been deprived of both procedural due process and substantive due process.

It appears to the Court that the City failed to follow the procedural scheme set forth in its Ordinances for dealing with dangerous dogs. Nonetheless, the issue of whether Folkers is entitled to recover under a § 1983 claim is much more complicated. Folkers will be required to establish a violation of his constitutional right to due process. As the United States Supreme Court indicated in *Parratt*, some cases require a predeprivation hearing before a governmental unit interferes with a property interest enjoyed by its citizens, while in other cases post-deprivation remedies made available by the governmental unit can satisfy the due process clause. 451 U.S. at 537-538. The Court identified a number of cases which

---

[19] The Court notes parenthetically that similar cases are generally based on the Fourth Amendment, which ensures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See, e.g., Skinner v. Chapman*, 326 F. Supp. 2d 431, 433 (W.D.N.Y. 2004); *Andrews v. City of West Branch*, 454 F.3d 914, 918 (8th Cir. 2006); *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994); *Dziekan v. Gaynor*, 376 F. Supp. 2d 267 (D. Conn. 2005); *Hatch v. Grosinger*, 2003 WL 1610778 (D. Minn.) at *4; and *Warboys v. Proulx*, 303 F. Supp. 2d 111 (D. Conn. 2004) (dismissing Plaintiff's Fifth Amendment claim because he had not previously sought compensation, but allowing Plaintiff to amend to allege a Fourth Amendment Claim).

> recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.

*Parratt*, 451 U.S. at 539.

In addition, there are substantial issues raised by Defendants' affirmative defenses, including application of the doctrine of qualified immunity. It is not possible for the Court to make a meaningful determination, at this early stage of the proceeding, regarding the likelihood that Folkers will prevail on the merits. It would appear that Cleo attacked Sassy without provocation, thereby meeting the definition of "dangerous dog" set forth in the Ordinance.[20] The Ordinance also provides, however, that the owner may "remove such dangerous dog from the city."[21] The United States Supreme Court has indicated that even a "temporary, nonfinal deprivation" may be actionable. *Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972). *But See Skinner v. Chapman*, 326 F. Supp. 2d 431 (W.D.N.Y. 2004). The issue of whether Folkers was deprived of his constitutional right to due process by the pre-hearing seizure of Cleo, thereby giving rise to compensatory damages, is yet to be litigated. That is a different issue, however, than whether a temporary injunction should issue, requiring Cleo to be returned to Folkers' possession pending a hearing.

### 4. *Where Does the "Public Interest" Lie?*

Obviously, the public has an interest in seeing that their constitutional rights are protected from governmental abuse. In addition, however, the public has an interest in seeing that dangerous dogs are not permitted to run loose. The Court believes that these counterbalancing interests do not substantially support Folkers' request for a preliminary injunction.

---

[20] *See* Ordinance § 5-1B-1(B) (Defendants' Exhibit F).

[21] *See* Ordinance § 5-1B-4(E) (Defendant's Exhibit F).

16

### 5. *Summary*

After carefully considering the factors set forth in *Dataphase Systems*, the Court concludes that Folkers has failed to establish entitlement to a preliminary injunction, returning Cleo to his possession while the appeal process is pending. The undersigned Magistrate Judge respectfully recommends that the District Court deny that portion of Plaintiff's request for a preliminary injunction.

### B. *Is Folkers Entitled to a Preliminary Injunction, Prohibiting the City Council From Relying on the Third Alternative Definition of "Dangerous Dog?"*

Folkers also requests that the Court enter a preliminary injunction, prohibiting the City Council from relying on the third alternative definition of "dangerous dog," as found in the City Ordinance. A "dangerous dog" is defined in the City Ordinance as follows:

> A. Any dog with a known propensity, tendency, or disposition to attack unprovoked, to cause injury to, or to otherwise endanger the safety of humans or other domestic animals; or
>
> B. Any dog which attacks a human being or other domestic animal without provocation; or
>
> C. Any dog declared to be dangerous by the city council or an animal control officer.

*See* Ordinance Number 5-1B-1 (Defendants' Exhibit F).

Folkers claims that the alternative definition found in Paragraph C is unconstitutionally vague. At the time of hearing, Folkers' counsel conceded that even if the alternative definition found in Paragraph C is found to be unconstitutionally vague, it does not affect the validity of the definitions found in Paragraphs A and B. Defendants' counsel represented at the hearing that Defendants intend to rely on the definition found in Paragraph B, and do not intend to rely on the definition found in Paragraph C. Folkers nonetheless seeks the Court's ruling on this issue, however, arguing that the City has

17

"ignored" the advice of its counsel previously and Folkers "is not confident that the City would follow the advice of their attorney."[22]

The alternative definition set forth in Paragraph C defines a "dangerous dog" as any dog "declared to be dangerous" by the city council or an animal control officer. While Defendants' counsel would not concede at the time of hearing that Paragraph C is unconstitutionally vague, Defendants do not provide any argument or authority on the issue in their briefs. The Court agrees with Folkers that this circular definition does not provide any guidance for the public and is unconstitutionally vague.[23]

Applying the four factors in *Dataphase*, the Court concludes that Folkers would be irreparably harmed if the Court failed to enjoin the City from relying on the third alternative definition of "dangerous dog," as set forth in Ordinance Number 5-1B-1. That is, the City may not find Cleo to be a "dangerous dog," by simply declaring her to be "dangerous." Rather, if the City Council finds that Cleo is a "dangerous dog," it must rely on the definitions found in Paragraphs A or B of Ordinance Number 5-1B-1. Therefore, the undersigned Magistrate Judge respectfully recommends that the District

---

[22] *See* Post-Hearing Brief (docket number 19) at 11.

[23] The standards for evaluating vagueness were enunciated in *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972):
> Vague laws offend several important values. First, because we assume that man is free to steer from lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

(cited with approval in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)).

Court enjoin the City Council from relying on the third alternative definition of "dangerous dog," as set forth in Ordinance Number 5-1B-1(C).

## VII. SUMMARY

For the reasons set forth above, I believe that Plaintiff has failed to show his entitlement to a preliminary injunction, requiring that Cleo be returned to his possession pending an appeal before the Waterloo City Council. It is my further belief that the Temporary Restraining Order (docket number 8) previously entered by the Court should be set aside, and the Waterloo City Council should be permitted to reschedule the appeal hearing. Finally, I believe that a temporary injunction should issue, prohibiting the City Council from relying on the third alternative definition of "dangerous dog," as set forth in Ordinance Number 5-1B-1(C).

## VIII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the District Court rule as follows:

1. Plaintiff's request for a preliminary injunction, requiring that Cleo be returned to his possession pending an appeal before the Waterloo City Council, should be **DENIED**.

2. The Temporary Restraining Order previously entered by the Court, staying and prohibiting the Waterloo City Council from proceeding with the appeal hearing, should be **SET ASIDE**.

3. Plaintiff's request for a preliminary injunction, prohibiting the City Council from relying on the third alternative definition of "dangerous dog," as set forth in Ordinance Number 5-1B-1(C) should be **GRANTED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B), that within ten (10) days after being served with a copy of these proposed findings and recommendations, any party may serve and file written objections with the District Court.

DATED this 12th day of October, 2007.

_____
JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA